OCIE HAMPTON, Administratrix of the Estate of JOHN LEO HAMPTON, Deceased, v. WABASH RAILROAD COMPANY, a Corporation, Appellant.—No. 40021.—204 S. W. (2d) 708.

Division One, September 8, 1947.

Rehearing Denied, October 13, 1947.

*Joseph A. McClain, Jr., J. H. Miller, John S. Marley* and *Sebree, Shook, Hardy & Hunter* for appellant.

1000

*Trusty & Pugh, Guy W. Green, Jr.,* and *Raymond Falzone* for respondent.

1002

DOUGLAS, P. J.—Plaintiff as administratrix of her husband's estate recovered judgment for $40,000 under the Federal Employers' Liability Act, 45 U. S. C. A., sec. 51, against the defen-

dant railroad. Plaintiff's husband, John Hampton, was killed by defendant's passenger train No. 2 about two and one-half miles west of Truesdale. He was twenty-nine years old. He had worked as a track man for fifteen years and served as foreman of an extra gang during the summer seasons for three years or more. At the time of his death he was in charge of an extra gang of seventeen men, engaged in raising, ballasting, lining up, and straightening the railroad track. The track would be raised by jacks, ballast would be shoveled under the ties, and then John Hampton and nine men working under him would tamp the ballast with eight air hammers before replacing the track.

This work was being done in a deep cut, known as "Dead Man's Cut", on a long curve. Going east the curve inclined to the left for about 1600 feet and was down grade. At a point about 300 feet east of the beginning of the curve the cut began, and it extended eastwardly for 1250 or 1300 feet or for the balance of the curve. The banks of the cut were covered with trees, brush, and shrubbery which tended to further reduce the extent of visibility around the curve to a limit of about 200 feet.

John Hampton and his nine men were working in the cut about 975 feet from its west end when they were run down by defendant's eastbound train going 75 miles per hour. On the day of the accident John Hampton had a "slow board" placed at the side of the track about a mile west of where he and his crew were working. Under defendant's rules this indicated that the track one mile distant from the board was in condition for a speed of not more than ten miles an hour, unless a different speed was specified by a train order. Train orders had been issued that all but first class trains should reduce speed to 25 miles per hour at that location. Train No. 2 being a first class, fast passenger train, regularly scheduled, was thus authorized by defendant to ignore the slow board, and did not have to reduce its speed.

On August 4, 1942, the day of the casualty, train No. 2 was late. It normally went east through the cut a little before one o'clock in the afternoon, the hour the men resumed work after their dinner. During the noon hour of that day it had been decided to move the air compressor, a gasoline engine on wheels which compressed the air for the operation of the hammers used for tamping, after train No. 2 had passed by. Men were sent in each direction from the location of the work to flag everything after No. 2 passed and to caution all trains to proceed carefully because the compressor was about to be moved along the track.

George Hampton, an uncle of the deceased, was in charge of operating the compressor and also acted as watchman or lookout man at a post on top of the south bank about opposite the compressor and west of where the men were working. After his dinner he started the

gasoline engine which operated the compressor. The compressor was at the side of the track about 250 feet west of where the men were working with the hammers. After starting the compressor he walked eastwardly disconnecting pipe which was attached to the compressor. Finishing this he retraced his steps westwardly to the compressor, and made a minor adjustment on the engine. Just as he started for the other side of the track to take his lookout post he saw train No. 2 was "right there." He had heard no warning. The ten men at the hammers, including plaintiff's husband, were killed.

Under defendant's rules enginemen must sound the whistle approaching curves and when the view is restricted by weather or other unusual conditions enginemen must sound the whistle at frequent intervals to warn trackmen and others. There was evidence that it was also the practice to sound the whistle all the way around curves in cuts for the protection of the men that might be working on the curve; and because ▆▆▆ of this long established practice section men expected and relied upon such warnings. Plaintiff charged that the written rules and the long established custom were violated by train No. 2.

▆▆ The issue of negligence submitted to the jury was the failure of train No. 2 to sound a warning upon going into the curve, and while going around the curve in the cut.

Viewing the evidence in its light most favorable to plaintiff, we find there was substantial evidence to show that a whistle could have been heard by the men working at the hammers, had the whistle been sounded. Defendant's track supervisor, who had held such position for 18 years, testifying for defendant said that a whistle could be heard above the noise of the hammers from a distance of approximately a mile, and that the sounding of a whistle in addition to also having a watchman looking out for approaching trains would "give that much more protection." George Hampton testified that when he was at the compressor he could hear a whistle if sounded close by, and when he was walking away from the hammers and toward the compressor he could hear a whistle a mile and a half away, and that he was relying on such a warning while he was working about the track. To be sure there was contrary testimony that a whistle could not always be heard by those operating the hammers, but as we have said the whole evidence was sufficient to permit the jury to find that sounding a whistle could have prevented the casualty.

Without a whistle the approach of the train could not be heard. The evidence was undisputed that no whistle was sounded after a warning for a highway crossing was begun about a quarter of a mile west of the beginning of the curve, and the custom of whistling around curves in cuts was not observed although the placing of the slow board and issuance of train orders gave notice that men were

working on the track in the cut where the extent of visibility of the crew of No. 2 was greatly reduced.

Thus, plaintiff sustained the burden of proof necessary for recovery under the Federal Employers' Liability Act. There was substantial evidence showing that defendant was negligent in failing to warn and that such negligence was the proximate cause in whole or in part of her husband's death. Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54; Tennant v. Peoria & Pekin Union R. Co., 321 U. S. 29. We find defendant's negligence was "a link in an unbroken chain of reasonably foreseeable events." Brady v. Southern R. Co., 320 U. S. 476.

■ However, defendant insists it was entitled to a directed verdict on the ground the casualty was a result of deceased's primary and sole negligence in violating an order requiring him not to operate the compressor unless he had a watchman on the bank, such violation being the primary and sole cause of his death.

Defendant's track supervisor testified he had verbally instructed deceased "to protect the track when he was working with a slow order for all except first-class trains, and to have the track in safe condition for first-class trains, and not to operate the compressor unless he had a watchman on the bank where he could see approximately two miles." A section foreman testified he heard the track supervisor tell deceased a day or two before the accident occurred "to have a watchman present, . . . to have a lookout man on that bank to watch out for trains." The evidence fails to show that when the accident occurred there was a lookout man on the bank.

Defendant, in support of its contention, relies on Frese v. Chicago, B. & Q. R. Co., 263 U. S. 1; David v. Kennedy, 266 U. S. 147; Unadilla Valley Ry. Co. v. Caldine, 278 U. S. 139; Unadilla Valley Ry. Co. v. Dibble, 31 F. (2d) 239; Willis v. Penn. R. Co., 122 F. (2d) 248; Southern Ry. Co. v. Hylton, 37 F. (2d) 843; Van Derveer v. Delaware, L. & W. R. Co., 84 F. (2d) 979; and Yoakum v. Lusk (Mo.), 223 S. W. 53.

This court held in the Yoakum case that a car repairer who violated a rule requiring employees occupied in repair work to place blue signals, and who would not have been ■ injured except for such violation was not entitled to recover under the Federal Employers' Liability Act. The court found the defendant railroad was guilty of no negligence whatever. And in Flack v. Atchison, T. & S. F. Ry. Co., 285 Mo. 28, 224 S. W. 415, we also denied recovery under the Federal Employers' Liability Act where the death resulted from the sole negligence of deceased in failing to follow instructions. For other discussions see Williamson v. Wabash R. Co., 355 Mo. 248, 196 S. W. (2d) 129; and Stuart v. Dickinson, 290 Mo. 516, 235 S. W. 446; Mech v. Terminal R. Assn., 322 Mo. 937, 18 S. W. (2d) 510; Perry

v. M.-K.-T. R. Co., 340 Mo. 1052, 104 S. W. (2d) 332; Kamer v. M.-K.-T. R. Co., 326 Mo. 792, 32 S. W. (2d) 1075.

The Frese case commenced an apparently new line of decision under the Federal Employers' Liability Act in the United States Supreme Court. That case involved an Illinois Statute which provided that when a train approached a crossing with another railroad upon the same level the engineer of the approaching train "shall positively ascertain that the way is clear and that the train can safely resume its course before proceeding" to pass the crossing. Plaintiff's intestate was the engineer on the Burlington and was killed when struck by a Wabash engine at such a grade crossing. Suit was instituted first in this state and plaintiff recovered before a jury by showing an alleged custom and usage which required the fireman to notify the engineer of trains approaching from his side of the engine. This court held that there was no evidence of such a custom, and even had there been it could not have abrogated the Illinois Statute, and reversed plaintiff's judgment. 290 Mo. 501, 235 S. W. 97. The United States Supreme Court, on certiorari, affirmed this court. It stated: "Moreover, the statute makes it the personal duty of the engineer positively to ascertain that the train can safely resume its course. Whatever may have been the practice, he could not escape this duty, and it would be a perversion of the Employers' Liability Act [giving citations] to hold that he could recover for an injury primarily due to his failure to act as required, on the ground that possibly the injury might have been prevented if his subordinate had done more . . . There is no doubt the statute of Illinois applied to this case." The opinion did not find the fireman was guilty of any negligence, rather it negatived such a possibility. There was no negligence charged against the crew of the Wabash engine. We understand the opinion to hold that since plaintiff's intestate was *solely* negligent plaintiff could not recover.

In the Davis case plaintiff, as representative of a deceased engineer, was denied recovery where the engineer disobeyed instructions and violated his "primary" duty even though his injury might "possibly" have been prevented if those in secondary relation to the movement had done more.

In Unadilla, etc. v. Caldine the court again denied recovery on the ground the disobedience of a positive rule was the sole cause of the casualty, and refused to hold that the failure of some other employee to stop Caldine from doing what he ought not to do even partially caused the casualty.

We find in 35 Am. Jur., Master and Servant, sec. 407 the doctrine drawn from these United States Supreme Court cases stated as follows: "In accord with the well-settled rule that there can be no recovery under the Federal Employers' Liability Act where the negligence of the employee is the sole proximate cause of the injury, it

is very generally held that where a violation of a regulation or instruction promulgated by the employer is the sole proximate cause of the injury, there can be no recovery under the Federal Employers' Liability Act." See also Willis v. Pennsylvania R. Co., 122 F. (2d) 248; Prosser on Torts, p. 547; 21 Minnesota Law Review, 110.

However, Van Derveer v. Delaware, L. & W. R. Co., 84 F. (2d) 979 apparently extends the rule to hold that even where the disobedience of a rule amounts only to contributory negligence, not sole negligence, still there can be no recovery. It states: "The doctrine is merely that if the injured employee has contributed to his injury by the breach of a rule or an instruction ad hoc, he cannot recover." But it appears to us that this pronouncement is contrary to the act which provides that contributory negligence is not a bar to recovery but goes only to reduce damages. We find the rule stated directly contrary to that in the Van Derveer case in the same Sec. 407 of Am. Jur., Master and Servant: "But the rule is otherwise where, although the violation of a rule or order of the employer may have contributed to the injury, such violation is not the sole proximate cause thereof; in such case, the violation of the rule does not bar recovery although it is to be considered in mitigation of the recoverable damages."

In the instant case, assuming the deceased was instructed not to operate the compressor unless he had a watchman on the bank, we do not believe his violation of such instruction was in and of itself the sole and only cause of the casualty. The mere placing of a watchman on the bank would not insure the safety of the men at work on the track. The watchman must first discover the approaching train in time to warn the men, then transmit the warning in time for them to reach a place of safety. It was the duty of defendant to sound the whistle to warn the watchman of the train's approach. It appears to us that the giving of this instruction to deceased did not thereby relieve defendant of its duty to warn by whistle as prescribed by its rules and by custom and practice, a duty which it owed whether a watchman was stationed on top of the bank or not.

We hold that deceased's violation of such instruction (which we have assumed for the purpose of this opinion) was at the most only one of the proximate concurring causes of the accident, and defendant's failure to warn was also a proximate concurring cause, so that plaintiff is not barred from recovery under the act.

This case comes within the ruling of Rocco v. Lehigh Valley R. Co., 288 U. S. 275. That case discussed the United States Supreme Court decisions we have mentioned above, and pointed out that in each of them the decedent's negligence was the proximate cause of the accident and in none was there any negligence on the part of employees operating the train moving in the opposite direction, with which the collision took place. It went on to hold that the violation

of a rule by plaintiff's husband in that case was only a concurrent cause and not the primary cause of the accident; and that his negligence did not preclude a finding by the jury that his death was in part due to the negligence of the railroad's servants. That is the same situation we have in the instant case.

Accordingly, we hold the action of the trial court in refusing to direct a verdict for defendant was proper, and its refusal to instruct the jury that decedent was guilty of negligence as a matter of law was also proper.

Defendant claims the instructions are confusing. Plaintiff's main instruction was on defendant's failure to warn by whistle and directed a verdict if the jury found such failure caused or directly contributed to the accident. Plaintiff next instructed on the measure of damages if decedent was not guilty of contributory negligence. The next instruction explained that under the Federal Employers' Liability Act contributory negligence of a person killed would not defeat recovery but should be considered in the diminution of damages. Defendant then offered an instruction on sole cause. It told the jury that deceased was obliged to exercise care in looking out for approaching trains and if he failed to do so and such failure was the sole cause of his death, the verdict must be for defendant. The plaintiff countered with an instruction that if both plaintiff and defendant were guilty of negligence and their negligence combined to cause decedent's death, then the jury must find the issue as to sole cause in favor of plaintiff.

Defendant claims that its sole cause instruction was undermined because plaintiff's instructions did not clearly distinguish between sole negligence and contributory negligence so that plaintiff's instructions were in conflict with defendant's sole cause instruction, were confusing and misleading, and constituted prejudicial error. We do not find this to be so. The instructions do not conflict, they distinguish the issues, and are not confusing. The real gravamaan of defendant's complaint seems to be that since it did not offer an instruction on contributory negligence that plaintiff had no right to do so. The cases appear to hold that a defendant cannot complain about a failure to instruct on the effect of contributory negligence under the act in the absence of a request by defendant. Failure to instruct on this issue has been held to be non-direction rather than misdirection. But no case has been cited which holds that the plaintiff may not volunteer such an instruction, especially under circumstances where contributory negligence might be fairly inferred from the evidence as is the situation here. See Hendon v. Kurn, 351 Mo. 980, 174 S. W. (2d) 806.

Plaintiff's instructions clearly told the jury that contributory negligence would not defeat recovery which certainly tended to obviate any confusion between it and defendant's instruction on sole negli-

gence which told the jury in effect that sole negligence would defeat recovery. It is not contended that plaintiff could not offer a counter instruction to defendant's one on sole cause. Compare Baker v. Kansas City Public Service Co., 353 Mo. 625, 183 S. W. (2d) 873.

Complaints as to other instructions are not supported by the record.

■ Defendant claims the verdict of $40,000 is excessive.

Deceased was twenty-eight years old at the time of his death. His expectancy was 33.03 years. He left two sons aged two and four. He had worked for the defendant for some fifteen years. In summer he was employed as foreman of an extra gang, in winter he would revert to a track man. He earned in 1939, $1,062. 08; in 1940, $1,183.31; in 1941, $1,353; and in seven months in 1942 an average of $162.44 per month.

In 1942 we held a verdict of $30,000 in a similar case to be excessive by $5,000. There the decedent was six years older and also left two children surviving. Finley v. St. Louis-San Francisco Ry. Co., 349 Mo. 330, 160 S. W. (2d) 735. But in 1945 in Mooney v. Terminal R. R. Assn., 353 Mo. 1080, 186 S. W. (2d) 450 where deceased (aged 30) also left surviving two infant children we sustained an award of $35,000, in addition to $10,000 for conscious pain and suffering. After reviewing previous awards, we said in that case: "The question of the amount of damages is primarily for a jury. It is apparent from the above cases that the appellate courts do attempt the difficult task of trying to harmonize verdicts. However, unless a verdict is grossly excessive or inadequate courts should not interfere . . . Taking into consideration the above cases, the economic conditions existing at the time those cases were decided, and the conditions that now prevail, the age of Mooney at the time of his death, his life expectancy and the widow and the two small children, we cannot say that $35,000 is so excessive as to authorize our interference."

In the case at bar, taking notice of the further change in economic conditions and the continued diminishing purchasing power of the dollar since the Mooney case was decided, we cannot hold that a verdict of $40,000 under all the circumstances is grossly excessive.

The judgment is *affirmed*. All concur.